UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LARA PETTY, THOMAS and LESLIE SHIEL, NIKOLAS and DIANA MORIATES, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>UNISON AGREEMENT CORP., UNISON MIDGARD HOLDINGS, LLC, and ODIN NEW HORIZON REAL ESTATE FUND, LP,<br><br>Defendants. | Case No. 3:26-cv-749<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1. A home is often a person or family's most valuable and important asset. For some North Carolinians, living with dignity in old age is only possible with the proceeds from the sale of a home. For others, passing a home on to children is essential to build intergenerational wealth. For still others, the proceeds from the sale of a first home make it possible to buy a second home large enough to accommodate a growing family or provide access to better schools.

2. A relatively new financial product, known as a home equity sharing agreement, threatens all that by transferring the equity North Carolinians build in their homes from homeowners to private equity investors through agreements that skirt lending and mortgage laws designed to protect consumers and homeowners from usurious terms.

3. Unison Agreement Corporation offers a financial product that operates much like a reverse mortgage: Unison pays the homeowner an initial sum in exchange for ownership of a large percentage of the equity in the house.

4. When the homeowner sells the house, dies, or is at the end of a 30-year term, Unison collects its percentage of the home's equity from the proceeds of a sale, forcing that sale if

necessary.

5. Homeowners may end up owing Unison more than three times the amount Unison originally loaned them just a few years after signing Unison's form contracts.

6. While Unison's product looks and functions much like a reverse mortgage, Unison's business model only works if Unison can operate outside of all lending and mortgage laws.

7. North Carolina law creates strong protections for homeowners in the field of mortgage lending. These include disclosure rules to ensure homeowners understand the cost of credit and licensing requirements to ensure that home loans are being made lawfully by legitimate companies.

8. Unison attempts to sidestep these safeguards by calling its product an "option" contract rather than a loan.

9. As the Ninth Circuit recognized, however, what determines whether Unison's product is a mortgage loan isn't the label Unison uses, but the substance of the product. *See Olson v. Unison Agreement Corp.*, 2025 WL 2254522 (9th Cir. Aug. 2, 2025). And what Unison offers is an advance of funds to be repaid at a later date, with substantial interest, secured by a home. In other words, it is a residential mortgage loan.

10. Plaintiffs are typical examples of North Carolina homeowners who have fallen victim to Unison's scheme. Lara Petty is a North Carolina homeowner who is on disability and entered a Unison Agreement to help cover the cost of unexpected repairs and mold remediation resulting from water damage. Thomas and Leslie Shiel are North Carolina homeowners who simply needed some additional funds to help cover the cost of home renovations and weren't aware of the usurious nature of the Unison Agreement. And Nikolas and Diana Moriates are North

Carolina homebuyers who thought the Unison Agreement would give them the breathing room that they needed when purchasing a home in their new state and weren't aware of the hidden risks of the Unison Agreement.

11. All these North Carolina residents have fallen victim to Unison's unfair and deceptive practices.

**PARTIES**

12. Homeowner Lara Petty is a citizen of the State of North Carolina. In 2024, Ms. Petty entered into a HomeOwner Agreement with Unison.

13. Homeowners Thomas and Leslie Shiel are citizens of the State of North Carolina. In 2019, Mr. and Mrs. Shiel entered into a HomeOwner Agreement with Unison.

14. Homeowners Nickolas and Diana Moriates are citizens of the State of North Carolina. In 2020, Mr. and Mrs. Moriates entered into a HomeBuyer Agreement with Unison.

15. Defendant, Unison Agreement Corporation (UAC), is a Delaware corporation with a principal place of business at 650 California St., Fl. 1800, San Francisco, CA 94108 and with its principal office location at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

16. Defendant, Unison Midgard Holdings, LLC, is a Delaware corporation with a principal place of business at 650 California St., Fl. 1800, San Francisco, CA 94108.

17. Defendant, Odin New Horizon Real Estate Fund, LP is a Delaware limited partnership with its principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, California 94111.

18. Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

19. Together, Defendants are joined, by agreement, in a joint venture or common

enterprise and are referred to collectively herein as "Unison" except where otherwise specified.

20. Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are also co-conspirators and responsible for the acts of one another.

21. Defendants are referred to collectively as "Unison" in this complaint.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a).

23. There is complete diversity of citizenship between the parties.

24. The amount in controversy exceeds $75,000. Each Plaintiff seeks relief from a future payment obligation that exceeds $75,000.

25. Venue is proper in this District under 28 U.S.C. § 1391, as the acts, omissions, or transactions that give rise to this action occurred, in substantial part, in this District. Specifically, Plaintiffs Lara Petty and Thomas and Leslie Shiel's homes, which serve or served as the collateral for Unison's illegal loans, are located in this District, and Plaintiffs were in this District when they signed Unison's form agreements.

## SUMMARY OF FACTUAL ALLEGATIONS

### A. The Structure of the Unison Agreements.

26. Unison drafted and presented to Plaintiffs and Class Members a standardized set of four transaction documents on a take-it-or-leave-it basis.

27. The four documents Unison presents to North Carolina homeowners as part of its "Unison HomeOwner Agreement" are: (1) the Unison HomeOwner Covenant Agreement, (2) the Unison HomeOwner Option Agreement, (3) the Unison HomeOwner Deed of Trust and Security Agreement, and (4) the Memorandum of Unison HomeOwner Agreement.

28. The four documents Unison presents to North Carolina homebuyers as part of its

"Unison HomeBuyer Agreement" are different in name only. They are: (1) the Unison HomeBuyer Covenant Agreement, (2) the Unison HomeBuyer Option Agreement, (3) the Unison HomeBuyer Deed of Trust and Security Agreement, and (4) the Memorandum of Unison HomeBuyer Agreement.

29. In all other material respects, the Unison HomeOwner Agreement and Unison HomeBuyer Agreement (together, the "Unison Agreements") are identical.

30. Stripped of deliberately complex accounting, lengthy contracts, and opaque terminology, Unison's product is a loan. Unison provides homeowners an advance in exchange for a large payment in the future, secured by a mortgage on the home.

31. The operative features of the Unison Agreements are the same features as a traditional loan:

32. **Advance of Funds:** Unison provides an advance called a "Unison Investment Payment,"[1] which is a small percentage of the "Original Agreed Value" of the home.

33. Unison pays a portion of this advance to the borrower. The remainder of the Unison Investment Payment covers all the origination fees and costs for the transaction.

34. **Origination Fees:** Unison charges a "transaction fee," appraisal fee, inspection fee, settlement costs, and a fee to cover mortgage and deed recording costs.

35. Since these amounts are taken from the Unison Investment Payment amount, they reduce the amount that is disbursed to the homeowner.

36. These origination fees and costs exceed five percent of the Unison Investment Payment—far higher than customary origination costs for HELOCs or reverse mortgages.

37. **Secured Interest:** Unison records a deed of trust on the home, which secures all

[1] At various times, Unison has also called this advance the "Unison Initial Payment."

the homeowner's payment obligations under the contracts—on pain of foreclosure.

38. **Repayment Obligation:** The borrower is required to pay Unison money based on the value of her home when an "Exercise Event" occurs.

39. The Exercise Events that trigger the end of the contract and payment are the expiration of the 30-year team of the Agreement; the sale of the property; the owner's death; or the owner's default.

40. At the time of an Exercise Event, the secured claim amount that Unison demands from the homeowner is calculated as follows: Unison multiplies its "Investor Percentage," which is often as high as 70%, by the present value of the home and then subtracts the "Unison Purchase Price Balance."

41. The Unison Purchase Price Balance is the difference between the Unison Investment Payment advanced at origination and the value of the Investor Percentage at origination.

42. Stripped of the complex mathematical formulas, the practical result is that the homeowner (or her estate) is forced to pay Unison far more than she received—and far more than the law allows—when an Exercise Event occurs.

43. For example, in the case of Mr. and Mrs. Moriates, Unison estimates that its secured claim could be as much as $269,405 if an Exercise Event were to occur as of June 2026. Unison calculates that obligation as follows: First, it takes the home's present value, estimated at $813,152, and multiplies that by the Investor Percentage of 52.5%, resulting in $426,904. Unison then subtracts the "Purchase Price Balance" of $157,500, resulting in a payment obligation of $269,405.

44. **Default:** Upon default, the deed of trust authorizes Unison to accelerate repayment,

tack on "protective advances" that are treated as additional secured debt, impose liquidated damages, and exercise foreclosure and "orderly sale" remedies.

45. These remedies are indistinguishable from those of a conventional mortgage lender.

46. The practical result is that, to satisfy Unison's secured claim, in 30 years or less, the borrower (or her estate) will be forced to pay Unison far more than she received—and far more than the law allows.

**B. Unison's repayment protections.**

47. On top of this, the Unison Agreements include additional provisions to guarantee Unison receives payment (plus fees) even in adverse scenarios.

48. For example, if a borrower sells her home during the first 36 months of the contract, she will have to pay Unison what amounts to a pre-payment penalty, requiring payment of *the greater* of: (a) her initial advance (plus fees); or (b) the amount Unison would receive from the sale.

49. After three years, if a borrower wants to remove the deed of trust on her home and get out from under this onerous contract without leaving her home, she will have to pay Unison *the greater* of: (a) the Unison Investment Payment plus additional fees; or (b) the amount Unison would receive if she sold her home.

50. If a borrower defaults on any of her obligations under the Unison Agreement, Unison can foreclose and force the sale of the home and is expressly guaranteed repayment of its advance at a minimum.

51. Even outside of the scenarios where Unison is expressly guaranteed repayment, there are several features of Unison's product that ensure it will be repaid in practice.

52. Unison uses a "very sophisticated data infrastructure and pricing structure" to target

specific regions, areas, neighborhoods, and even specific houses to ensure that it picks homes that will rise significantly in value, maximizing its return. *Podcast Transcription Session No. 103—Thomas Sponholtz & Jim Riccitelli*, Lend Academy (hereinafter "Unison Podcast") (2017), https://perma.cc/5RZ4-TP2K.

53. The company touts that: "We have a 10-year forecast on every house in America so we have a very sophisticated data infrastructure and pricing structure [for] what we call turning a house into a security." *Unison Podcast*.

54. Unison further secures its returns when it makes its loan offer to homeowners.

55. The starting point for that offer is the home's appraised value. On information and belief, Unison uses appraisal vendors who minimize this value to lower its payment to homeowners and increase its returns under the Agreement.

56. Unison also protects its interest by overtly deflating the original appraised value of the home to reach what Unison calls a lower "Original Agreed Value." This increases the effective percentage of future appreciation the homeowner must forfeit to Unison.

57. To ensure that nothing will decrease the value of the home or jeopardize Unison's future payment, the Unison Agreements require the homeowner to pay for all the taxes, insurance, maintenance, and repairs on the home.

58. If the homeowner fails to do so, Unison can foreclose on the home to get its payment, make "protective advances," which themselves accrue fees and interest and are added to the principal that the homeowner will have to pay Unison, and/or collect liquidated damages.

59. Unison also has the right to adjust the "Ending Agreed Value" of the home, or sale price, by requiring the homeowner to pay more to Unison if Unison determines that the homeowner failed to properly maintain or repair the property.

60. Unison can also reduce the Unison Purchase Price Balance—again requiring the homeowner to pay more to Unison—if Unison finds that the homeowner has violated the agreement or failed to maintain the property sufficiently.

61. The length of Unison's contract further ensures repayment. As Unison says, "home equity tends to increase with the years of homeownership." *2022 Unison Home Equity Report*, Unison (2022), https://perma.cc/2EWT-6Q4H/. The term of the contract is thirty years, and Unison reports that the contracts remain in place for ten years on average. *Unison Podcast*. Over the course of this "longer term holding period[]," Unison itself states, "real estate tends to perform fairly consistently." Indeed, the Unison Agreements explicitly set forth that the homeowner must intend to live in the home for more than three years or otherwise be considered in breach.

62. Unison is also protected because homeowners will have the least incentive to sell their homes during a drop in housing prices.

63. To further prevent a homeowner from selling when prices are low, Unison gives itself the power to effectively scuttle a sale.

64. If Unison determines that the sale price is too low, Unison can in its "discretion" take steps that will significantly delay the sale, which could effectively prevent it from going through.

65. Unison disclaims any liability to the homeowner related to the company's delay of the sale.

66. Unison also requires properties to be owner-occupied, since other properties "carry additional risk." FAQ, Unison, https://www.unison.com/faq (answering question "What is the Owner Occupancy Requirement?").

67. This requirement restrains homeowners from moving, renting out their property, or

using their property as an investment to support themselves rather than Unison.

68. Unison further protects its interest by restricting homeowners from accessing the equity in their property. Unison imposes a "maximum authorized debt" limit—a fixed dollar figure—and forbids additional loans over that amount secured by the property, or other loans that "materially impair Investor's Rights" such as "reverse mortgage loans, shared appreciation mortgage loans, mortgage loans with negative amortization or prepayment penalties," and others.

69. In substance, the Unison Agreements operate as high-cost, nonrecourse mortgage loans that provide for repayment of principal plus substantial contingent deferred interest.

**C. Unison's deceptive marketing scheme.**

70. Because Unison's product is so harmful to homeowners, Unison systematically misrepresents how the product works, the company's relationship to the homeowner, and the substantial costs involved.

71. **Unison misrepresents the nature of its product.** Unison markets the Unison Agreement as a "co-investment" or "equity sharing agreement." It insists that this arrangement is "not a loan" but an "option."

72. Unison's representations are false and misleading.

73. As previously detailed, Unison's Agreements have the same operative features as a traditional mortgage loan.

74. Unison's CEO has described this kind of product as "similar to any home financing transaction." Jim Wood, *Equity Access*, Marin Magazine (Apr. 10, 2007), https://marinmagazine.com/community/local-business/equity-access/.

75. The "offer" marketing documents show that the homeowner will be required to pay the loan at or before the end of the thirty-year term: "If you have not sold your Property or

otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by paying Unison an amount equal to the value of its investment interest in the Property at that time." This language is not conditional on a purported exercise of an option.

76. Various documents involved in the process also state expressly that the Agreement is a loan.

77. Title and closing documents repeatedly refer to the homeowner as the "borrower."

78. These documents also refer to Unison as the lender.

79. And they refer to Unison's advance payment as a "loan."

80. Unison also advertises that its Agreement involves "no debt," "no interest," and "no monthly payments." Those representations appear on Unison's website, in promotional brochures, in mailers, and through sales representatives.




*Figure 1*: Excerpt from a composite image of a Unison "Mailer" *compiled from publicly available footage of the Unison mailer. See* BeatTheBush, *Access Home Equity with No Payments Unison Review,* Youtube (Mar. 6, 2019), at 0:30–2:00, https://www.youtube.com/watch?v=YtlpO8gljsE (last visited September 16, 2026) (video showing and reading from the Unison direct-mail solicitation).

81. Unison's claim that homeowners do not take on added debt is false. Debt is a future payment obligation, which Unison's contract requires. *See, e.g.*, Debt, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/debt ("something owed" or "obligation to pay or repay someone or something in return for something received").

82. Unison's claim that there is no interest is also false.

83. Interest is merely the amount of money owed by a borrower to a lender for the advance of money—that is, the cost of the loan. *See, e.g.*, Interest, *Black's Law Dictionary* (12th ed. 2024) ("The compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp., the amount owed to a lender in return for the use of borrowed money.").

84. The future payment homeowners make to Unison includes money that homeowners owe in exchange for the advance payment. Calling that return a "share of appreciation" does not change its function as the cost of the advance. The amount is deferred and contingent, but it is still compensation for the money Unison provided.

85. Unison's representations that the product is not a loan are material and designed to hide the true nature of Unison's financial product—extremely expensive credit.

86. **Unison misrepresents its relationship to the borrower.** Unison also consistently markets the arrangement as a "partnership" with homeowners. Unison's website states that "Unison is your partner, here when you need us." *Equity Sharing Agreement*, Unison, https://www.unison.com/equity-sharing-agreement.

87. Its advertisements similarly state: "This is a partnership, fair and square." *How it Works - Unison Equity Sharing – Homeowner*, YouTube, https://youtu.be/KG7ygY6_sWM?feature=shared&t=42.

88. But buried in dozens of pages of contracts, Unison's Agreement itself says the opposite: "[Unison] shall not be deemed a partner . . . with, or of, Owner."

89. Nor does Unison act like a partner. An essential element of partnership is the sharing of losses or expenses. *See, e.g.*, 68 C.J.S. Partnership § 131.

90. Unison, however, has structured this transaction so the homeowner bears all the expenses, and Unison will rarely, if ever, share any losses.

91. Partners also owe each other a fiduciary duty. *See, e.g.*, 59A Am. Jur. 2d Partnership § 270 ("One of the paramount duties of partners among themselves, if not the primary duty, is their fiduciary duty, universally recognized as including a duty to exercise good faith and maintain the highest integrity in dealing with other partners."); 68 C.J.S. Partnership § 569 ("General partners owe their limited partners the duty of utmost good faith or honesty and loyalty or obedience, as well as candor, due care, and fair dealing.").

92. However, Unison's contract expressly disclaims any fiduciary obligations to the homeowner.

93. And as an SEC-registered investment advisor, Unison Investment Management is legally required to act in the best interest of its own investors, not in partnership with homeowners. *2023 Responsible Investing Report*, Unison, at 19 (2023), https://contentimages.o-prod.unison.com/pdf/Unison_ESG_report_2023.pdf?utm_content=esg-page-hero ("Unison Investment Management maintains a fiduciary responsibility to our investors.").

94. **Unison hides the true costs of its Agreements.** The Unison Agreements misleadingly describe themselves as paying the homeowner a large "Unison Purchase Price," often several hundred thousand dollars. As explained, Unison only gives the homeowner a smaller fraction of that amount–the Unison Investment Payment—up front. The majority of the "Unison

Purchase Price" to the homeowner is illusory, as it is paid to the homeowner out of the equity that the homeowner already had before Unison's involvement.

95. Unison also tells homeowners that the company will share in the homeowner's ups and downs. But in practice, Unison's product is structured to ensure that the company will disproportionately benefit from rising home values and will rarely, if ever, share in any loss in home values.

96. In written materials provided to homeowners and on its website, Unison gives homeowners the impression that there is an equal chance of their home value increasing and decreasing over the term of the loan, such that Unison shares in the risk of loss or gain.

97. For example, in its "offer" marketing materials, Unison provides "Examples of the Payment to Unison" that share two scenarios of the home value increasing, two scenarios with the home value decreasing, and one scenario of the home value staying unchanged.

98. These materials also provide "estimated annualized percentage costs" for several hypothetical scenarios using figures that do not align with the actual loan amounts, and do not include fees in the calculations (as a typical APR calculation would).

99. These purported disclosures obscure the magnitude of the repayment obligation rather than clarify the cost of the loan.

100. In contrast to these representations to homeowners, Unison tells its investors that the company ensures—through, among other things, its modeling and home value forecasts and manipulation of appraisal values—that the homes on which it has mortgages are nearly guaranteed to increase in value over the course of the contract, such that the result of the contract is that Unison will gain money and the homeowner will lose money. Indeed, Unison touts to its institutional investors its portfolio's extraordinary 20.7% annualized net return.

101. These misleading, deceptive, and confusing assertions are compounded by the lengthy and opaque nature of Unison's documents. The "contract" consists of several different documents totaling up to 100 pages.

102. And the contract documents are full of fine print and legalese and contain terms that are insufficiently defined or defined in another document. The Unison Agreement documents are extremely confusing to understand for professionals—let alone regular homeowners.

**D. Unison's business model is structured to ensure the company profits at homeowners' expense.**

103. Unison's business model and practices in securitizing its loans further confirm that Unison's Agreements function as mortgage loans, ensure the company's own future profits, and demonstrate that Unison is not partnering with homeowners. While Unison touts its product as an innovative "investment," rather than a loan, its model is akin to that used by other mortgage lenders. Like many other mortgage lenders, Unison originates loans to homeowners that are secured by their homes. Unison then immediately bundles these loans into securitized trusts. Unison markets these securitized trusts to institutional investors, promising large rates of return. As with other mortgage loans, Unison turns pools of mortgages into investments for hedge funds and institutional investors—but they remain mortgage loans to the homeowners.

104. Unison was founded by Thomas Sponholtz, who is currently the Chief Executive Officer of Equity Exchange, Unison Agreement and Unison Management.

105. Sponholtz worked at Bear Stearns and then at Barclays Global Investors. At Barclays, he got the "big idea" for Unison's business model, when he was "looking around for large asset classes [he] could add to [Barclays] client's portfolio." *Unison Podcast*.

106. Sponholtz identified residential property as an untapped source of profits for a financial technology company.

107. Residential real estate is lucrative because, as Sponholtz explained, over the medium term, it tends to increase in value. *Id.*; *see also* Unison Investment Management, https://perma.cc/X53U-FMZR (touting strong performance of residential real estate over time).

108. Residential real estate is also a huge potential market, as it is the "largest asset class both globally and in the US." *Unison Podcast*.

109. The typical way to profit from residential real estate is to purchase homes and rent or resell them. However, Sponholtz explained, this method is inefficient because it requires "tremendous administrative cost in maintaining and being a property manager of [] homes." *Id*. The Unison model is thus built to extract the home's value and increases in that value, without the costs or burdens of actually purchasing, owning, or maintaining the homes themselves. *Id*.

110. That's why Unison's business model requires homeowners to bear all the costs and burdens of home purchase and ownership, including property taxes, insurance, maintenance, and management, while Unison can sit back and receive large payments for its loans.

111. Once Unison locks a homeowner into its mortgage loan, the company places a lien on the home to protect its interest, and then pools the loans into a securitized trust, which it sells to private investors such as hedge funds.

112. Unison has issued securitizations of hundreds of millions of dollars of its HomeOwner Agreements. *Unison issues $443 million residential equity agreement securitization*, Unison (Aug. 20, 2025), https://www.unison.com/press/national_mortgage_news_unison-issues-443-million-residential-equity-agreement-securitization; *Unison Announces DBRS Rated Securitization of $215 Million of Unison Home Equity Sharing Agreements*, Unison (June 6, 2024), https://www.unison.com/press/unison-second-dbrs-rated-securitization; *Unison Announces Securitization of $165 Million Unison Home Equity Agreements*, Unison (Sept. 20, 2023),

https://www.unison.com/press/unison-securitization-165-million-home-equity-agreements.

113. As the result of a product design that ensures future payments at the expense of homeowners, Unison's portfolio has "achiev[ed] a 20.7% annualized net return since 2012," more than two-fold the stock market's average annualized net return. *Residential Real Estate Generates Strong Returns!*, Unison Investment Management, https://perma.cc/X53U-FMZR.

114. In marketing to investors, Unison explains that its products have "unlimited upside and limited downside" as well as "low volatility and high risk-adjusted net returns compared to other major asset classes," including traditional home secured loans. *About Us*, Unison Investment Management, https://www.unisonim.com/about-us.

115. Thus, while Unison may publicly justify its evasion of homeowner protection laws by claiming that the company could lose money, Unison's statements to investors tell the real story: Unison's products are structured to ensure substantial profits at the expense of homeowners.

116. Unison's business model has allowed the company to expand rapidly. Unison touts that it has contracts with more than 10,000 homeowners on homes worth approximately $8.8 billion collectively.

**E. Plaintiffs are ensnared into predatory Unison mortgages.**

**i. Ms. Petty is locked into a Unison mortgage.**

117. Ms. Petty has owned her home in Huntersville, North Carolina since 2010.

118. Ms. Petty is unable to work due to a disability.

119. For her support, Ms. Petty relies on disability payments and rental payments from a roommate.

120. In approximately 2023, Ms. Petty was dealing with mold that had formed under the flooring in her bathroom due to a broken toilet flange as well as several other issues around her

home that required attention.

121. With her limited income, Ms. Petty was unable to afford to make the repairs.

122. Ms. Petty began researching her options and came across Unison online.

123. Ms. Petty was drawn in by the longer term advertised by Unison as well as its promises of a quick approval process.

124. As part of its origination process, Unison ordered an appraisal on Ms. Petty's home.

125. Unison chose the appraiser.

126. To arrive at an Original Agreed Value for Ms. Petty's home, Unison reduced the appraiser's estimate by 5%.

127. Unison also ordered an inspection of Ms. Petty's home.

128. Unison included a list of "maintenance items" identified through this inspection in a "Deferred Maintenance Addendum" to its HomeOwner Agreement with Ms. Petty. These included several items that were "not inspected."

129. If Ms. Petty does not correct or repair the items listed in the addendum before the end of the Agreement to Unison's satisfaction, Unison will have the right to increase its final payment by the estimated costs of those repairs.

130. On January 3, 2024, Ms. Petty signed Unison's thick stack of form documents.

131. Unison offered Ms. Petty an Initial Payment of $69,750, equal to 15% of her home's Original Agreed Value.

132. Before paying anything to Ms. Petty, however, Unison deducted $4,544.25 from the Initial Payment for loan and closing fees. This included $3,555 in transaction, appraisal, and inspection fees payable to Unison. It also included $989.25 in title and recording fees.

133. As a condition of its advance, Unison also required Ms. Petty to apply $2,870 of

her Initial Payment to other debt.

134. After these deductions, Ms. Petty received a lump sum of $62,335.75.

135. Today, just over two years after Ms. Petty entered her agreement, Unison already estimates that she could need to repay nearly twice that amount to Unison to exit her agreement. That works out to a simple annual interest rate of 24.2% and annualized percentage rate of 20.81%.

136. Moreover, even if Ms. Petty had the means to satisfy Unison's payment demand and remove Unison's lien without selling her home, she could not get out of her Unison agreement today. Her "Restriction Period"—a three-year span in which Unison dictates that a homeowner may not buy their way out of the agreement—will not expire until January 3, 2027.

137. In the meantime, Ms. Petty's payment obligation to Unison will likely grow.

138. Unison's current estimate likely understates what Ms. Petty would be obligated to repay if she were to sell today.

139. Under the vague terms of the Deferred Maintenance Addendum, Unison could demand thousands of dollars more for the "costs of repairs."

140. Ms. Petty would also be required to pay closing costs to remove Unison's lien on her home, which could amount to hundreds or thousands of dollars.

141. Ms. Petty feels trapped in her Unison Agreement.

**ii. The Shiels are locked into a Unison mortgage.**

142. Mr. and Mrs. Shiel have owned their home in Charlotte, North Carolina for over 25 years.

143. In 2019, the Shiels were renovating their kitchen and needed additional funds to complete the improvements.

144. Mr. Shiel began researching various home equity options and came across Unison

while googling.

145. On the surface, it appeared to Mr. Shiel that the Unison Agreement was a good idea because it didn't require an additional monthly payment. But Mr. Shiel had no idea of the long-term implications of the Agreement, particularly the inability to access his home's equity once the Unison Agreement was in place.

146. As part of its origination process, Unison ordered an appraisal on the Shiels' home.

147. Unison chose the appraiser.

148. Unison also ordered an inspection of the Shiels' home.

149. Unison included a list of "maintenance items" identified through this inspection in a "Deferred Maintenance Addendum" to its HomeOwner Agreement with the Shiels.

150. If the Shiels do not correct or repair the items listed in the addendum before the end of the Agreement to Unison's satisfaction, Unison will have the right to increase its final payment by the estimated costs of those repairs.

151. On March 15, 2019, Mr. and Mrs. Shiel signed Unison's thick stack of form documents.

152. Unison offered the Shiels an initial Unison Investment Payment of $31,217, equal to 11.27% of their home's Original Agreed Value

153. Before paying anything to the Shiels, however, Unison deducted $1,217 from the Investment Payment for a Transaction Fee owed to Unison, which Unison defined as all costs associated with originating the Unison HomeOwner Agreement, including credit reports, appraisals, home inspections, recording fees and taxes, and settlement fees.

154. As a condition of its advance, Unison also required the Shiels to apply $18,921 of the Investment Payment to other debt.

155. After these deductions, the Shiels received a lump sum of $11,079.

156. Today, Mr. and Mrs. Shiel would need to repay Unison more than three times the amount of the Investment Payment, and about nine times the amount of the lump sum that they received. That works out to a simple annual interest rate of 23.8% and annualized percentage rate of 14.6%.

157. This estimate likely understates the Shiels' repayment obligation.

158. Under the vague terms of the Deferred Maintenance Addendum, Unison could demand thousands of dollars more for the "cost of repairs."

159. The Shiels would also be required to pay closing costs to remove Unison's lien on their home, which could amount to hundreds or thousands of dollars.

160. Additionally, Mr. and Mrs. Shiel haven't been able to touch the equity in their home, which they were planning to leverage to help pay for their daughter's college tuition.

161. The Shiels later tried to get a traditional home equity line of credit but were unable to do so.

162. Like Ms. Petty, Mr. and Mrs. Shiel feel locked into a no-win situation and trapped in their Unison Agreement.

**iii. The Moriates are locked into a Unison mortgage.**

163. In 2016, Diana and Nickolas Moriates moved from New York to North Carolina with their three children for Mr. Moriates's work.

164. They lived in rental homes in Wake Forest, North Carolina for about 18 months before moving to another rental home in nearby Apex, North Carolina.

165. The Moriates began receiving brochures from Unison at their rental home in Apex, which prompted them to start looking to buy a home instead of continuing to rent.

166. Unison advertised that the Moriates could afford a better home with its help than what they could afford on their own. At the time, the Moriates were renting a small place for a lot of money, so that promise was appealing.

167. In flyers and emails featuring photos of high-end homes, Unison promised that they could offer the Moriates the money that they needed to fulfill their dream, with no monthly payments and at no interest.

168. The Moriates also received phone calls from Unison's marketing department that advertised a downpayment equity-sharing loan.

169. Finding a house that they could afford, in a neighborhood where their children would be able to attend a good school, had proved difficult, so the Moriates reached out to Unison to learn more.

170. Unison told them that what it offered was a partnership, not a loan, and that the Moriates would only have to pay them if their home value increased. If it sank, Unison would share in the loss.

171. Soon after, the Moriates found a home for their family. The home was one they could afford to purchase without money from Unison.

172. But Unison still insisted that the Moriates would be better off by "partnering" with Unison.

173. With its help, Unison told the Moriates, they could make a down payment of 20% and avoid the additional monthly expense from private mortgage insurance.

174. Lured by the promise of a little more breathing room in their monthly budget, the Moriates accepted Unison's offer.

175. On February 5, 2020, the Moriates closed on their home and their Unison

HomeBuyer Agreement.

176. After Unison deducted its $1,575 transaction fee from its "Initial Payment," it paid a lump sum of $61,425 towards the Moriates' down payment.

177. In return, in thirty years or less, the Moriates must pay Unison that advance plus 52.5% of their home's change in value.

178. As a further condition for its advance, Unison also required the Moriates to agree to comply with several onerous terms for the life of the agreement.

179. For example, Unison imposed a fixed dollar limit on the debt that the Moriates may secure with their home.

180. Since entering their agreement with Unison, the Moriates have faced numerous hardships, including periods of unemployment and serious illness.

181. Thanks to Unison's lien and onerous contractual terms, they have not been able to tap into their equity to weather these storms. Instead, they have been forced to turn to other forms of high-cost debt to meet their financial needs.

182. If the Moriates were to exit their Agreement today, Unison estimates that they would have to repay as much as four times what they originally received from Unison. That works out to a simple interest rate of around 50% and an annualized rate of approximately 25%.

**F. Plaintiffs' transactions with Unison were structurally identical.**

183. Plaintiffs never met in person with anyone from Unison.

184. At no point did Unison or its agents explain the true cost or impact of the transaction to Plaintiffs.

185. Unison told Plaintiffs that they would not need an attorney for the closing.

186. Unison required Plaintiffs each to sign at least eight separate documents comprising

their contractual agreements with Unison. These included the Unison HomeOwner Option Agreement, Unison HomeOwner Covenant Agreement, Memorandum of Unison HomeOwner Agreement, Unison HomeOwner Deed of Trust, and Unison Non-Owner Occupant Notice. [2]

187. As part of these contracts, Plaintiffs granted Unison mortgages on their homes, which secured their obligations under the contracts on penalty of foreclosure.

188. Unison drafted all the documents Plaintiffs signed.

189. Unison presented the documents to Plaintiffs on a take-it-or-leave-it basis.

190. Plaintiffs have limited experience in complex financial transactions.

191. Unison is a multi-million-dollar financial technology company.

192. Unison's complex methods of market and financial analysis give it far superior knowledge of how the contracts will work in practice.

193. Unison was not licensed to offer mortgage loans under N.C.G.S. § 53-244.040 when it entered into the Agreements with Plaintiffs.

194. Unison did not provide required lending disclosures to Plaintiffs.

195. Instead, Unison provided "disclosures" that did not comply with lending laws and were designed to be confusing and misleading.

196. As a result, Unison obscured the finance charges and cost of the credit.

197. Plaintiffs did not, and could not, understand the true nature of the agreements and their future payment obligations to Unison.

198. Unison's agreements with Plaintiffs were structured so that Unison paid Plaintiffs each an initial advance, received security through a mortgage on their respective homes, and

[2] Mr. and Mrs. Moriates signed these same documents under the HomeBuyer title.

required future payment.

199. Unison's agreements with Plaintiffs ensured that their future payments to the company would almost certainly far exceed the advances they received.

200. Had Plaintiffs understood the true costs of their transactions with Unison at the time they entered into the contracts, they would not have agreed to them.

**CLASS ACTION ALLEGATIONS**

201. Plaintiffs bring this class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

202. Plaintiffs seek certification of the following class:

> All North Carolina residents who entered into a Unison Agreement or similar product with Unison.

203. The class is so numerous that joinder of all members is impractical. While the exact number and identity of class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery, public records show that Unison has liens on at least hundreds of North Carolinians' homes. Unison's own records will provide both the precise number and identities of the class members.

204. There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

- Are Unison's products high-cost home loans under N.C.G.S. § 24-1.1E?
- Did Unison engage in prohibited practices in making high-cost home loans?
- Did Unison's Agreements contain terms that are prohibited in high-cost home loans?
- Are Unison's contracts usurious under N.C.G.S § 24-1 and § 24-1.1E?
- Are Unison's contracts and practices deceptive under N.C.G.S. § 75-1.1?

- Are Unison's contracts and practices unfair under N.C.G.S. § 75-1.1?

205. Plaintiffs' claims are typical of the class claims because they, like the class members, entered into Unison Agreements. Plaintiffs' contracts with Unison are typical, as at all relevant times, Unison's contracts with all class members have contained materially similar terms with respect to the structure of its advance payments; purported "option" mechanisms for ensuring its future payment; securing the homeowners' obligations through a security interest in a residence; and deceptive characterizations of the product.

206. Plaintiffs will fairly and adequately protect the interests of the class because they share the same interests in challenging Unison's practices as the rest of the class, their interests do not conflict with the interests of the class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

207. Unison has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

208. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating class members' claims. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM
**Per Se Violation of the Unfair and Deceptive Trade Practices Act**
**N.C.G.S. §§ 75-1.1, *et seq.* –**
**Prohibited Terms and Practices in High-Cost Home Loans**
**in Violation of N.C.G.S. § 24-1.1E**

209. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

210. It is an unfair or deceptive act or practice in or affecting commerce in violation of

the provisions of N.C.G.S. § 75-1.1 to make a high-cost home loan that violates any provisions of N.C.G.S § 24-1.1E(b) or (c). N.C.G.S § 24-1.1E(d).

211. Unison's Agreements are high-cost home loans under N.C.G.S § 24-1.1E.

212. A "high-cost home loan" is a loan, other than a reverse mortgage transaction, made to a natural person, for personal, family, or household purposes, and secured by a mortgage or deed of trust upon real estate that is or will be their principal dwelling. The loan's principal amount must also be under $300,000 and its terms must exceed at least one of three statutory thresholds. N.C.G.S § 24-1.1E(a)(4).

213. In North Carolina, a reverse mortgage loan must be secured by a first position lien on the borrower's principal residence. N.C.G.S. § 53-257.

214. **The Penalty Threshold:** A closed-end loan is a "high-cost home loan" if "the loan documents permit the lender to charge or collect prepayment fees or penalties more than 30 months after the loan closing." N.C.G.S § 24-1.1E(a)(6)(c).

215. **The Rate Threshold:** A loan is also a "high-cost home loan" if "the annual percentage rate of the loan at the time the loan is consummated is such that the loan is considered a "mortgage" under 15 U.S.C. § 1602(bb). N.C.G.S § 24-1.1E(a)(6)(a).

216. A junior loan is considered a "mortgage" under 15 U.S.C. § 1602(bb)(1) if it charges an annual percentage rate of interest that is more than 8.5% above the average prime offer rate ("APOR") for a comparable transaction.

217. Where a loan's interest rate "may vary at any time during the term of the loan for any reason" the relevant rate is "the maximum rate that may be charged during the term of the loan." 15 U.S.C. § 1602(bb)(1)(B).

218. **The Fee Threshold:** A loan is also a "high-cost home loan" if the total loan amount

is more than $20,000 and it charges qualifying points and fees that exceed 5% of that amount ("the fee threshold"). N.C.G.S § 24-1.1E(a)(6)(b).

219. Unison's Agreements with Plaintiffs are high-cost home loans.

220. In return for Unison's advance of funds, Plaintiffs are required to pay Unison at a future time.

221. Plaintiffs used the advance for personal, family, or household purposes, including to assist with a down payment for their family home and to support home repairs and renovations.

222. Plaintiffs' obligations to pay Unison are secured by deeds of trust on Plaintiffs' principal dwellings.

223. Unison's Agreements with Plaintiffs are not reverse mortgage loans because they are secured by second position liens on Plaintiffs' homes.

224. The principal amount on Unison's Agreements with each of the Plaintiffs is less than $300,000.

225. The Agreements' prepayment penalty terms exceed the penalty threshold because Unisons' Agreements with Plaintiffs give it the right to charge Plaintiffs a prepayment penalty more than 30 months after closing.

226. The Agreements' rate terms also exceed the rate threshold.

227. The interest rate on Unison's Agreements can vary at any time during the loan for any reason. Accordingly, the applicable interest rate is "the maximum rate that may be charged during the term" of that Agreement. 15 U.S.C. § 1602(bb)(1)(B).

228. There is no limit on the maximum rate that Unison may charge Plaintiffs during the terms of their Agreements. The applicable interest rate is, therefore, always more than 8.5% above the average prime offer rate.

229. The Agreements' fees also exceed the fee threshold.

230. Unisons' Agreements with Plaintiffs contain terms that are prohibited in high-cost home loans.

**Violation No. 1: Inclusion of Prohibited Balloon Payment Term**

231. Unison's Agreements with Plaintiffs contain prohibited balloon payments. N.C.G.S § 24-1.1E(c)(1).

232. Plaintiffs' final payment is scheduled to become due upon the occurrence of one of Unison's exercise events.

233. This payment will be more than twice as large as the average of their earlier scheduled payments (because there are no earlier payments).

**Violation No. 2: Inclusion of Prohibited Negative Amortization Schedule**

234. Unison's Agreements with Plaintiffs also contain prohibited negatively amortizing payment schedules.

235. The Agreements offer a single payment schedule in which homeowners make the equivalent of $0 periodic payments.

236. This payment schedule causes the loan's principal balance to increase. N.C.G.S § 24-1.1E(b)(2).

237. Unison has also engaged in prohibited acts and practices in making high-cost home loans.

**Violation No. 3: Lending Without Home-Ownership Counseling**

238. Unison made its Agreements with Plaintiffs without receiving certification from an approved housing counselor that Plaintiffs had "received counseling on the advisability of the loan transaction and the appropriate loan" for them. Accordingly, it violated N.C.G.S § 24-1.1E(c)(1).

**Violation No. 4: Lending Without Due Regard to Repayment Ability**

239. Unison made its Agreements with Plaintiffs without due regard for their repayment ability in violation of N.C.G.S § 24-1.1E(c)(2).

240. In North Carolina, a lender may not make a high-cost home loan unless they reasonably believe, based upon consideration of the borrower's income and financial resources *other than their equity in the dwelling that will secure the loan*, that the borrower will be able to make the loan's scheduled payments.

241. Plaintiffs' do not have sufficient income or other financial resources to repay the money they owe to Unison under their Agreements.

242. Plaintiffs will only be able to repay their debt to Unison if they draw on their home equity by, for example, selling their homes.

243. Unison could not reasonably believe, based upon consideration of the permissible factors, that Plaintiffs would be able to make the lump sum payment that is scheduled to become due when their Agreements' end.

**Violation No. 5: Financing of Fees and Charges**

244. Unison directly financed fees in making its high-cost home loans to Plaintiffs in violation of N.C.G.S § 24-1.1E(c)(3).

245. Unison charged Plaintiffs transaction fees in connection with their Agreements.

246. For Plaintiffs Petty and Shiels, Unison also charged Plaintiffs appraisal fees and various other closing costs.

247. Rather than require Plaintiffs to pay these fees out-of-pocket at closing, Unison added them to Plaintiffs' principal obligations. When Plaintiffs' Agreements end, they will be required to repay these fees with interest.

248. Unison has violated N.C.G.S § 24-1.1E in numerous ways. Each violation is a per se violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1.

249. Each of Unison's violations was willful.

250. Unison's violations of N.C.G.S. § 24-1.1E are continuous.

251. As a direct and proximate result of Unison's unfair acts or practices, Plaintiffs have suffered an injury in fact and lost money. Specifically, Plaintiffs injuries consist of the transaction fees they paid to Unison and the impairment to their property rights created by the Unison Agreements and Unison's deeds of trust on their homes.

252. Plaintiffs and the class are entitled to legal relief against Unison, including recovery of treble damages, costs of suit, and such further relief as the Court may deem proper. N.C.G.S. § 75-16.

253. Plaintiffs and the class are also entitled to reasonable attorneys' fees.

## SECOND CLAIM
## Usurious Loan
## N.C.G.S. § 24-1.1E and § 24-1

254. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

255. Making a high-cost home loan that violates any provisions of N.C.G.S § 24-1.1E(b) or (c) is usurious. N.C.G.S § 24-1(d).

256. For the reasons stated above, Unison has made high-cost home loans that violate numerous provisions of N.C.G.S § 24-1.1E(b) or (c).

257. Unison structured its loan for the purpose of evading the provisions of this section.

258. Unison's conduct is usurious. N.C.G.S § 24-1(d)

259. Plaintiffs and the class are entitled to relief, including forfeiture of any interest due

under the agreement and damages in twice the amount of any interest they have paid to Unison. N.C.G.S § 24-2.

**<u>THIRD CLAIM</u>**
**Violation of the Unfair and Deceptive Trade Practices Act**
**N.C.G.S. §§ 75-1.1, *et seq.***
**(Unfair Acts and Practices)**

260. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

261. Unison's conduct described above is unfair within the meaning of the North Carolina Unfair and Deceptive Trade Practices Act. N.C.G.S. § 75-1.1.

262. Unison engaged in unfair acts or practices by marketing and selling its Agreements to Plaintiffs and other North Carolina consumers in a manner that purposely attempts to avoid residential mortgage and high-cost mortgage lending laws. Unison's agreements are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

263. Unison offended established public policy by misrepresenting material facts about its loans, improperly influencing appraisals in connection with the loans, and engaging in unfair, misleading, or deceptive advertising. N.C.G.S. § 53-244.111(1).

264. Unison continues to engage in these unfair practices.

265. Unison further offended established public policy when it engaged in the mortgage business without a license under N.C.G.S. § 53-244.040.

266. Unison's unlicensed activity is continuous.

267. Unison's marketing and sale of its Agreements occurred in and affected commerce within the meaning of the North Carolina Unfair and Deceptive Trade Practices Act.

268. As a direct and proximate result of Unison's unfair acts or practices, Plaintiffs have suffered an injury in fact and lost money. Specifically, Plaintiffs injuries consist of the transaction

fees they paid to Unison and the impairment to their property rights created by the Unison Agreements and Unison's deeds of trust on their homes.

269. Plaintiffs are therefore entitled to legal relief against Unison, including recovery of actual damages, treble damages, attorneys' fees, costs of suit, and such further relief as the court may deem proper.

**FOURTH CLAIM**
**Violation of the Unfair and Deceptive Trade Practices Act**
**N.C.G.S. §§ 75-1.1, *et seq.***
**(Deceptive Acts or Practices)**

270. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

271. Unison's contract documents contain several statements that have the capacity and tendency to deceive members of the public.

272. Unison repeatedly represents that its products are not loans or debts, but its Agreements are residential mortgage loans and high-cost home loans

273. Like reasonable consumers, plaintiffs relied on Unison's representations regarding the nature of Unison's product when they decided to enter their Unison Agreements.

274. The contracts Unison provided to Plaintiffs and the class repeatedly state that Unison will pay the homeowner an initial investment payment and an additional "Balance Payment" to exercise its option that is typically hundreds of thousands of dollars. For example, Unison's promised "Balance Payment" to Ms. Petty was $195,300.

275. This is likely to deceive reasonable consumers into believing that they would be receiving this sum of money from Unison.

276. However, as explained above, most of that amount is money they would have received from the sale of their home regardless of whether they ever entered a contract with

Unison.

277. Unison's contract also omits the true cost of its loan. This is a material omission, since the amount a homeowner will have to pay Unison will be very important to their decision of whether to enter into this contract.

278. This omission is particularly misleading in light of Unison's other statements that give the impression that Unison is as likely to lose money as to make money.

279. Based on its superior access to information, experienced analysts, sophisticated models, access to data on its past performance, Unison knows that it has structured its product to ensure that it is far more likely that Unison will receive a large sum of money from the homeowner, as Unison has repeatedly stated to its investors.

280. Like other reasonable consumers, Plaintiffs would not have entered into these contracts with Unison if Unison had accurately disclosed the true cost of the transaction and not engaged in deception regarding the risks and costs of the transaction.

281. Unison's contracts also misleadingly omitted the fact that Unison is not licensed to engage in lending, including mortgage lending.

282. This omission has the capacity and tendency to deceive members of the public since they would not suspect that Unison's products are illegal, unlicensed loans.

283. These violations have caused and continue to cause harm to Plaintiffs and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Unison.

284. Plaintiffs are therefore entitled to legal relief against Unison, including recovery of treble damages, attorneys' fees, costs of suit, and such further relief as the court may deem proper. N.C.G.S § 75-16.

## FIFTH CLAIM
**Declaratory Relief**
**Fee-Shifting Provision Unenforceable**

285. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

286. Federal courts "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

287. Unison's Agreements provide that, "[i]f a dispute arises out of the Unison… Agreement, then the prevailing party will be entitled to reasonable attorneys' fees and costs."

288. In North Carolina, no party may recover their attorneys' fees except as expressly authorized by statute.

289. No statute authorizes Unison to recover its attorneys' fees from Plaintiffs in an action challenging the validity of Unison's Agreements or its acts or practices in connection therewith.

**JURY DEMAND**

290. Plaintiffs hereby demand trial by jury as to all issues so triable in the above matter.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the defendants as follows:

A. An order certifying the proposed class and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An order declaring the Defendants jointly and severally liable;

C. Declaratory relief determining that the fee-shifting provision in the Agreements is unenforceable in this action;

D. Declaratory relief determining that the Unison Agreements are unlawful;

E. An order providing for any and all additional injunctive, equitable, or declaratory relief the Court deems appropriate, including equitable reformation of Unison's form agreements;

F. An order awarding treble damages under N.C.G.S. § 75-16;

G. Forfeiture of any interest due under the Unison Agreements under N.C.G.S § 24-2;

H. An order awarding damages in twice the amount of any interest paid to Defendants under N.C.G.S § 24-2;

I. An order awarding attorneys' fees and costs including under N.C.G.S. § 75-16.1;

J. Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED AND DATED this 18th day of September, 2026.

By: /s/ Matthew E. Lee
Matthew E. Lee
N.C. State Bar No. 35405
Jeremy R. Williams
N.C. State Bar No. 48162
Katharine W. Batchelor
N.C. State Bar No. 58261
**LEE SEGUI PLLC**
421 N. Harrington St., Suite 460
Raleigh, NC 27603
Telephone: (855) 496-7500
mlee@leesegui.com
jwilliams@leesegui.com
kbatchelor@leesegui.com

Toby J. Marshall, *Pro Hac Vice Forthcoming*
Blythe H. Chandler, *Pro Hac Vice Forthcoming*
Eleanor Eagan, *Pro Hac Vice Forthcoming*
**TERRELL MARSHALL**
**LAW GROUP PLLC**
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
tmarshall@terrellmarshall.com
bchandler@terrellmarshall.com
eeagan@terrellmarshall.com

*Attorneys for Plaintiffs and the Class*